21 F.3d 485
 44 Soc.Sec.Rep.Ser. 223, Medicare&Medicaid Guide P 42,182
STATE OF NEW YORK DEPARTMENT OF SOCIAL SERVICES, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary, U.S. Department of Health and
Human Services, 200 Independence Avenue, S.W., Washington,
D.C. 20201, Gail R. Wilensky, Ph.D., Administrator, Health
Care Financing Administration, 200 Independence Avenue,
S.W., Washington, D.C. 20201, Defendants-Appellees.
 No. 734, Docket 93-6158.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 2, 1993.
Decided April 4, 1994.
 
 Arvid E. Roach II, Covington & Burling, Washington, DC (Kurt A. Wimmer, Covington & Burling, Washington, DC, of counsel), for plaintiff-appellant.
 Christine H. Chung, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D.N.Y., Gabriel W. Gorenstein, Asst. U.S. Atty. of counsel), for defendants-appellees.
 Before: LUMBARD, KEARSE, and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 Beginning in January 1985, the State of New York Department of Social Services ("New York") developed a computer system for use in New York City that would improve New York's ability to perform eligibility determinations for Medicaid and other social services programs, and installed the system serially at 92 locations in New York City. The Health Care Financing Administration ("HCFA") has paid a portion of the development and operating costs of the system, but New York and the federal government disagree as to the extent of HCFA's obligation to pay operating costs incurred at individual sites as they became operational prior to the date in 1989 as of which the entire system was certified complete. New York contends that the Medicaid Act and principles of administrative procedure require a 75% contribution from HCFA, and HCFA contends that the Medicaid Act and administrative regulations adopted pursuant thereto require no more than the 50% contribution that HCFA has already paid. New York brought an administrative appeal before the Departmental Appeals Board ("DAB"), challenging HCFA's disallowance. After DAB upheld HCFA's decision, New York challenged that ruling in the United States District Court for the Southern District of New York (Conboy, J.), which granted summary judgment in favor of Defendants-Appellees Donna E. Shalala, Secretary of the U.S. Department of Health and Human Services (the "Secretary", "HHS"); HHS; Gail R. Wilensky, Administrator of HCFA; and HCFA.
 
 
 2
 We affirm.
 
 BACKGROUND
 A. Statutory and Regulatory Framework
 
 3
 Under the Medicaid Act, 42 U.S.C. Sec. 1396 et seq. (1988 & Supp. III 1991) (the "Act"), the federal government reimburses a portion of state expenditures for medical assistance to low income or disabled people. The level of federal funding available to a state, called the Federal Financial Participation ("FFP"), varies according to the service provided. See id. Sec. 1396b(a). Unless otherwise specified in Sec. 1396b, states are reimbursed for 50% of expenditures that are "found necessary by the Secretary for the proper and efficient administration of the State plan." Id. Sec. 1396b(a)(7). Enhanced funding is available in specific instances. See id. Sec. 1396b(a). Among the expenses that may be reimbursed at an enhanced level of FFP are those associated with the development and operation of computerized claims processing programs. In 1972, Congress determined that computerized systems for claims processing and information retrieval would reduce Medicaid costs. See H.R.Rep. No. 231, 92d Cong., 2d Sess. 8 (1972), reprinted in 1972 U.S.C.C.A.N. 4989, 5089. In order to encourage states to develop these systems, Congress amended the Act to provide 90% FFP for costs "attributable to the design, development, or installation of such mechanized claims processing and information retrieval systems," id. Sec. 1396b(a)(3)(A)(i), and 75% FFP for costs "attributable to the operation of [such] systems," id. Sec. 1396b(a)(3)(B).
 
 
 4
 The statutory language relevant to this appeal is as follows:
 
 Sec. 1396b. Payment to States
 
 5
 (a) Computation of amount
 
 
 6
 From the sums appropriated therefor, the Secretary ... shall pay to each State [quarterly] ...
 
 
 7
 * * * * * *
 
 
 8
 (3) an amount equal to--
 
 
 9
 (A)(i) 90 per centum of so much of the sums expended during such quarter as are attributable to the design, development, or installation of such mechanized claims processing and information retrieval systems as the Secretary determines are likely to provide more efficient, economical, and effective administration of the plan ... and
 
 
 10
 * * * * * *
 
 
 11
 (B) 75 per centum of so much of the sums expended during such quarter as are attributable to the operation of systems ... of the type described in subparagraph (A)(i) (whether or not designed, developed, or installed with assistance under such subparagraph) which are approved by the Secretary ...
 
 
 12
 * * * * * *
 
 
 13
 plus
 
 
 14
 * * * * * *
 
 
 15
 (7) ... an amount equal to 50 per centum of the remainder of the amounts expended during such quarter as found necessary by the Secretary for the proper and efficient administration of the State plan.
 
 
 16
 42 U.S.C. Sec. 1396b(a) (emphasis added).
 
 
 17
 In 1974, the Secretary promulgated regulations to implement Sec. 1396b(a)(3). Before a state may become eligible to receive federal reimbursement for developing or operating a computerized claims system, these regulations require a state to submit to the Secretary an Advance Planning Document describing the proposed system. See 42 C.F.R. Sec. 433.112(a). If the proposal meets the conditions outlined in the regulations, the Secretary will approve the system, see id. Sec. 433.112(b), and federal funds will become available at the 90% FFP rate for the system's "design, development, installation or improvement," id. Sec. 433.112(a). After the system is installed, "FFP is available at 75 percent of expenditures for operation of a mechanized claims processing and information retrieval system approved by HCFA, from the first day of the calendar quarter after the date the system met the conditions of initial approval, as established by HCFA (including a retroactive adjustment of FFP if necessary to provide the 75 percent rate beginning on the first day of that calendar quarter)." Id. Sec. 433.116(a). The regulations provide that HCFA will approve the system operation if, inter alia, "[t]he system [has] been operating continuously during the period for which FFP is claimed." Id. Sec. 433.116(d).
 
 
 18
 The regulations indicate that "[a]dditional HHS regulations and HCFA procedures for implementing these regulations" are set forth in Part 11 of the State Medicaid Manual ("SMM"). 42 C.F.R. Sec. 433.110(a)(1). Section 11255 of the SMM, known as the "transition funding policy," provides that:
 
 
 19
 Projects for designing, developing, installing, or improving an automated claims processing and information retrieval system will be funded during the transition between 90% FFP and 75% FFP as follows:
 
 
 20
 . FFP at the 90% level is available for design, development, installation, or improvement of each subsystem in an approved complete system meeting the requirements of Sec. 11205.
 
 
 21
 . FFP at the 90% level for any subsystem terminates on the date the subsystem or improvement to a subsystem is fully tested and subsequently accepted by the State.
 
 
 22
 . FFP at the 50% level is available for operation of any subsystem from that point that 90% FFP ceases until the complete system is fully operational and meets the requirements of Sec. 11210.
 
 
 23
 . FFP at the 75% level is available prospectively from the date the system is approved and retroactively to the date that the complete approved system is determined to be fully operational and meets all requirements as defined in Sec. 11210.
 
 
 24
 (Emphasis added.) SMM Sec. 11205 contains the conditions a state's system must meet before 90% FFP is available; SMM Sec. 11210 contains the conditions that must be met before 75% FFP is available. Federal payments have been made in accordance with the letter of these SMM procedures.
 
 B. New York's Computerized Systems
 
 25
 In 1977, New York instituted its Medicaid Management Information System (the "MMIS"), a mechanized claims processing and information retrieval system used primarily for processing claims for services rendered to Medicaid beneficiaries. In order to expand the volume of information regarding Medicaid eligibility that would be accessible to the MMIS, New York developed the Welfare Management System (the "WMS"), which determines recipient eligibility for all New York welfare programs, including Medicaid. While the WMS is not actually a component of the MMIS and may operate independently of it, an interface allows the MMIS to use the WMS's computerized data to facilitate and improve determinations regarding an individual's eligibility for Medicaid. The parties agree that, technically, the WMS is regarded as an "enhancement" of the MMIS under HHS regulations, rather than a "subsystem" or an "improvement" of the MMIS. An "enhancement" in this context is a modification of the functions of the MMIS that expands the MMIS beyond its original purposes. See 45 C.F.R. Sec. 95.605. The parties disagree as to whether the Secretary may reasonably apply the transition funding policy to an "enhancement."
 
 
 26
 New York's legislature authorized implementation of the WMS in two phases: first, in all areas of New York State outside the five boroughs of New York City (the "Upstate/WMS"); and second, in New York City (the "NYC/WMS"). The Advance Planning Document for the Upstate/WMS was approved by HCFA in 1977 (the same year New York instituted its MMIS), and New York installed the Upstate/WMS region-by-region in seven multi-county regions. Because the Upstate/WMS was being installed concurrently with New York's MMIS, and the parties had already agreed to a phased implementation of the MMIS, HCFA agreed with New York to review and approve the Upstate/WMS on the same basis, shifting from 90% FFP to 75% FFP for each region when all sites in the region were fully operating. At no time did HCFA fund a portion of the Upstate/WMS at 50% FFP. By March 1982, the Upstate/WMS was completely installed and fully operational. On this appeal, New York contends that installation of the NYC/WMS should have been funded on the same basis.
 
 
 27
 New York submitted its Advance Planning Document for the NYC/WMS to HCFA in November 1981. On February 22, 1983, HHS sent a letter to New York approving funding for the initial phase of the project, including "the development site and the three pilot sites." Letter from Dale W. Sopper, Assistant Secretary for Management and Budget at HHS, to John J. DiPalermo, Deputy Commissioner at New York Department of Social Services (Feb. 22, 1983). The letter recites that federal funding for Medicaid's share of the NYC/WMS will be paid at "50%; 75%; 90% FFP subject to the provisions of 42 CFR Part 433." A letter from HHS, dated October 18, 1984, notified New York that "approval of additional development and operation costs is conditioned on agreement" by New York that HCFA would provide 90% FFP for "[d]esign, development and installation" and 50% FFP for "[o]peration of modules at pilot sites and tiers." Letter from Wallace O. Keene, Acting Deputy Assistant Secretary at HHS, to John J. DiPalermo, Deputy Commissioner at New York Department of Social Services (Oct. 18, 1984). HHS also specified in the letter that:
 
 
 28
 Once city-wide implementation is complete (i.e., all modules and subsystems operating throughout New York City), the operating FFP for the HCFA share of the WMS/NYC will be at the 75 percent rate subject to HCFA review and approval.... [W]e plan to arrange a meeting with you to discuss the development/operations funding split. We want to ensure all parties have a common understanding of the split.
 
 
 29
 Representatives of New York and the federal government met on November 8, 1984, to discuss, among other issues, the funding split. At this meeting, memorialized in a letter dated November 14, 1984 from New York to HHS, the parties agreed that "a site will be considered operational (for a given module) 45 days after the first live applicant/case is processed." Letter from John J. DiPalermo, Deputy Commissioner at New York Department of Social Services, to Wallace Keene, Acting Deputy Assistant Secretary at HHS (Nov. 14, 1984). This definition of "operational" fixed the date on which each site would shift from development to operation for funding purposes. In addition, New York acknowledged that HCFA had taken the position that only 50% FFP would be available for operational costs "during the period of time when operations first begin until the time that the complete system is operational." Although New York decided to "review HCFA's position with the possibility of filing a request for waiver," New York does not claim ever to have sought or received such a waiver.
 
 
 30
 New York proceeded with its program for installing the NYC/WMS at 92 social services offices or sites. HCFA provided 90% FFP for developmental expenses. Although New York filed claims for 75% FFP for each site as it became operational, HCFA disallowed these claims, and paid only 50% FFP for operating expenses at each site prior to the time all 92 sites became operational. On November 23, 1992 (during the pendency of the district court proceedings), HCFA notified New York that the NYC/WMS had met the minimum federal requirements for initial approval, and that New York was authorized to claim 75% FFP for operational expenses. Since HCFA determined that the NYC/WMS had in fact become fully operational at all 92 sites on June 30, 1989, the 75% FFP rate applied retroactively to that date. Consequently, New York's claim is for reimbursement in an amount equal to the difference between 75% FFP and 50% FFP for the period October 1, 1987 to June 30, 1989.
 
 C. Procedural Background
 
 31
 New York appealed these disallowances to DAB, challenging HCFA's authority to require approval of the NYC/WMS's operation as a condition to payment of 75% FFP for operating expenses. New York argued that, as NYC/WMS was an enhancement to the MMIS, it was not subject to any approval requirements other than HCFA's initial approval of the NYC/WMS Advance Planning Document. Moreover, New York asserted that HCFA had acted arbitrarily and capriciously in subjecting the NYC/WMS to a review process that was different from that used for the Upstate/WMS.
 
 
 32
 After a hearing, DAB issued a decision on April 10, 1990, upholding the disallowances. DAB determined that HCFA had authority under its regulations and policies to subject the NYC/WMS to the same review and approval requirements as applied to the MMIS. DAB also found that HCFA had explicitly informed New York that city-wide operation of the NYC/WMS was a prerequisite for 75% FFP. Finally, DAB found that HCFA was justified in using a review process for the NYC/WMS different from that used for the Upstate/WMS, and that HCFA had not engaged in arbitrary discrimination. In June, September and December 1990, DAB denied New York's appeals from three additional disallowances, adopting the reasoning of the April 10, 1990 decision.
 
 
 33
 On December 10, 1991, New York challenged DAB's decision in the district court, arguing that: (1) the transition funding policy (to the extent that it allows 50% FFP) is contrary to the plain language of 42 U.S.C. Sec. 1396b(a)(3), which requires HCFA to reimburse WMS expenses at either 90% or 75% FFP; (2) the transition funding policy was adopted in violation of the notice and comment provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. Secs. 552 & 553; and (3) HCFA's application of the transition funding policy to the NYC/WMS was arbitrary and capricious. The parties filed cross-motions for summary judgment, and on January 29, 1993, the district court rejected New York's arguments and granted summary judgment in favor of the defendants. See New York Dep't of Social Services v. Sullivan, 811 F.Supp. 964 (S.D.N.Y.1993).
 
 
 34
 The district court found that the Act does not preclude HCFA's adoption of the transition funding policy, since that policy is consistent with the Secretary's reasonable interpretation of 42 U.S.C. Sec. 1396b(a)(3). The district court noted that there could be a period of time when a portion of a system (such as an individual NYC/WMS site) is not entitled to 90% FFP because it is no longer in development, and yet the complete system (comprising all NYC/WMS sites) is also not entitled to 75% FFP because it is not yet fully operating. In the interim, HCFA could provide 50% FFP for the operating portions of the NYC/WMS without offending Sec. 1396b(a)(3).
 
 
 35
 With respect to New York's contention that the transition funding policy was improperly promulgated, the district court found that the Secretary had provided New York with a copy of the relevant policy and requested comments on it. New York therefore had actual notice of the regulation, and was bound by it even if there had been a default by the Secretary concerning notice and comment procedures.
 
 
 36
 The district court also rejected New York's assertion that HCFA acted arbitrarily and capriciously in using different funding procedures for the NYC/WMS and the Upstate/WMS. While the district court viewed with skepticism HCFA's claim that differences between the two systems justified the difference in treatment, it nevertheless found that the Secretary had discretion to alter that policy in funding the NYC/WMS because of evidence in the record demonstrating that the Secretary was dissatisfied with the funding procedure that had been used for the Upstate/WMS.
 
 
 37
 New York moved for reargument on February 16, 1993 on the ground that, although receipt of SMM Part 11 gave New York actual notice of the transition funding policy, it did not receive notice that the Secretary intended to transform that policy into a substantive, binding regulation. The district court denied the motion on June 1, 1993, finding that the publication of a Notice of Proposed Rule Making in the Federal Register, which specifically referred to SMM Part 11 and included a summary of the transition funding policy, was adequate notice to New York that the transition funding policy was being proposed as a regulation. The district court also found that New York had been given sufficient opportunity to comment on the proposed rule.
 
 
 38
 New York filed its notice of appeal to this Court on June 21, 1993. On appeal, New York raises the same arguments that it raised in the district court. Because we are in general agreement with the district court's thorough opinion, we affirm.
 
 ANALYSIS
 
 39
 New York asks us to decide three questions: (1) whether HCFA's transition funding policy conflicts with the language of the Act; (2) whether HCFA was arbitrary and capricious in applying the transition funding policy to the NYC/WMS; and (3) whether the transition funding policy is unenforceable against New York by reason of HCFA's noncompliance with the notice and comment requirements of the APA, 5 U.S.C. Secs. 552, 553. We apply a de novo standard of review to a district court's grant of summary judgment. See Himes v. Shalala, 999 F.2d 684, 688 (2d Cir.1993).
 
 A. Construing The Statutory Language
 
 40
 New York first argues that the transition funding policy is inconsistent with the plain meaning of the language in Sec. 1396b(a)(3), which unambiguously provides a two-tier scheme for funding mechanized claims processing and information retrieval systems: 90% FFP for the design, development, or installation of a system, and 75% FFP for the operation of a system. New York contends that a computer system such as the NYC/WMS is first designed, then developed, next installed, and immediately begins operating without any hiatus between installation and operation. Since Sec. 1396b(a)(3) specifies how each of these phases are to be funded, New York contends that the transition funding policy--setting a funding level of 50% FFP from the time the WMS is installed and operating at one site until the time it is operational at all of the sites--is inconsistent with the statutory language. The Secretary takes the position that Sec. 1396b(a)(3) allows the payment of 75% FFP only for systems that are fully operational, and does not preclude payment of 50% FFP for fully installed components of a system (such as the individual NYC/WMS sites) until the entire system (here, comprising all 92 sites) is operational.
 
 
 41
 In reviewing an agency's construction of a statute, we first determine whether Congress has spoken to the precise question at issue. If it has, we give effect to Congress's expressed intent. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). If, however, the statute is silent or ambiguous, we will defer to the agency's interpretation if it is based on a permissible construction of the statute and is sufficiently reasonable. Id. at 844-45, 104 S.Ct. at 2782-83. "[T]he agency's construction need not be the only reasonable one in order to gain judicial approval." Connecticut Dep't of Income Maintenance v. Heckler, 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577 (1985).
 
 
 42
 Section 1396b(a)(3)(A)(i) provides that the Secretary will reimburse the states for 90% of their expenditures for the design, development, or installation of mechanized claims processing and information retrieval systems. Section 1396b(a)(3)(B) provides that the Secretary will reimburse the states for 75% of their expenditures for the operation of mechanized claims processing and information retrieval systems. However, as the district court concluded, there may be an interval between the time a component of a system is installed and the time the complete system is fully operational, and nothing in the statute mandates either 90% or 75% FFP for the operation of such a component during that interval. We therefore reject New York's contention that HCFA is foreclosed by the plain language of Sec. 1396b(a)(3) from reimbursing New York for the operation of the WMS sites, prior to city-wide implementation of the system, at the 50% FFP payable under Sec. 1396b(a)(7) for "the remainder of the amounts expended ... as found necessary by the Secretary for the proper and efficient administration of the State plan."
 
 
 43
 As the language of the statute does not settle the issue, we turn next to the reasonableness of the Secretary's position. We agree with the district court that the Secretary's recognition of a semi-operational stage, during which certain operating expenses may be funded at 50% FFP, is reasonable and is based on a permissible construction of the Act. Section 1396b(a)(3)(B) authorizes the payment of 75% FFP for costs attributable to "the operation of systems ... which are approved by the Secretary." New York and the Secretary disagree on the scope of the word "systems." New York views each WMS site as a free-standing enhancement to the MMIS that yields its intended benefit as soon as it begins operating. The Secretary views the NYC/WMS as a unitary system composed of 92 sites, and has adopted the position--which is reflected in the transition funding policy--that 75% FFP is not available for operation of a system until the complete system is fully operational. New York's position is hard to square with its Advance Planning Document, which described the NYC/WMS as a single system. The Secretary's approval of New York's proposal on that basis arguably provided an incentive for New York to achieve full operation at all sites expeditiously. The record further shows that one objective of the NYC/WMS was to develop an integrated data base that would replace the multiple computerized and manual files previously in use. Those files, and the burdens of using and maintaining them, could not be eliminated entirely until the NYC/WMS was implemented city-wide. Accordingly, we cannot say that it was unreasonable for the Secretary to require the operation of all 92 NYC/WMS sites before approving 75% FFP for operating expenses.
 
 
 44
 B. Applying the Transition Funding Policy to the NYC/WMS
 
 
 45
 New York next argues that, even if the transition funding policy is not inconsistent with Sec. 1396b(a)(3), the Secretary acted arbitrarily and capriciously in applying the policy to the NYC/WMS. New York claims that, because HCFA's funding of the Upstate/WMS paid 75% operational FFP as soon as each region graduated from the 90% FFP developmental stage, HCFA is required to fund the NYC/WMS on the same basis, albeit site-by-site rather than region-by-region, and that failure to do so was arbitrary and capricious.
 
 
 46
 In determining whether an agency has acted arbitrarily and capriciously in violation of 5 U.S.C. Sec. 706(2)(A), a court may not "substitute its judgment for that of an agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), but must determine whether the agency's decision " 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment,' " Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quoting Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). The Secretary does not dispute that she has used a different method to determine the level of funding for the NYC/WMS than was used for the Upstate/WMS. However, an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis," Chevron, 467 U.S. at 863-64, 104 S.Ct. at 2792, and " 'must be given ample latitude to adapt its rules and policies to the demands of changing circumstances,' " Rust v. Sullivan, 500 U.S. 173, 187, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991) (quoting Motor Vehicle Mfrs., 463 U.S. at 42, 103 S.Ct. at 2866 (internal quotation omitted)). An agency's new position is entitled to substantial deference so long as "there appears to have been good reason for the change." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 355-56, 109 S.Ct. 1835, 1849, 104 L.Ed.2d 351 (1989).
 
 
 47
 HCFA reviewed the implementation of the Upstate/WMS incrementally, reviewing each phase of the project as it was installed, and approving 75% funding for those parts of the Upstate/WMS that were operating. HCFA explains that this was done as a matter of convenience, because the Upstate/WMS was being installed concurrently with New York's MMIS and because HCFA had already agreed to review the MMIS incrementally. It was deemed efficient for that reason to review both systems at the same time. When New York installed the NYC/WMS, on the other hand, the MMIS was already completely in place. We agree with HCFA that it is reasonable to take into account the circumstances and opportunities presented by an individual project in reaching funding determinations. The potential for efficiency offered by the concurrent approval schedule of the Upstate/WMS and the MMIS was not presented by the installation of the NYC/WMS to augment an existing MMIS. Nor are we persuaded that the Secretary's application of the transition funding policy to the NYC/WMS, although otherwise reasonable, becomes unreasonable because she previously provided special region-by-region approval treatment to the Upstate/WMS. As we have just noted, that treatment fitted circumstances that, in the Secretary's estimation, made such treatment sensible. Moreover, testimony before DAB shows that, after the incremental approval of the Upstate/WMS was completed, HCFA believed that such an approval process was not "a viable methodology for evaluating the operation" of a system as large and complex as the MMIS or a WMS. Whether HCFA learned from its experience with the Upstate/WMS, or reached that conclusion on some other basis, is not clear from the record. However, if an agency determines that a regulatory interpretation is ill-advised, the agency may (and should) change course. A court reviewing the agency's decision to apply the revised interpretation must still give consideration to the agency's understanding of the regulations and statutes. See National Labor Relations Bd. v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).
 
 
 48
 New York argues that HCFA may have funded WMS-type projects in other states in the same way it funded the Upstate/WMS, and that the circumstances cited by the Secretary to justify HCFA's mode of implementing the Upstate/WMS may not have been present in other projects receiving similarly favorable funding. In its complaint filed in the district court, New York alleged that the application of the transition funding policy to the NYC/WMS was arbitrary and capricious "in light of HCFA's contrary treatment of the WMS in Upstate New York and, on information and belief, of similar systems in at least one other state." New York points to nothing in the record, however, that suggests any other state's system was given such contrary treatment. At oral argument, New York, in an apparent effort to avoid the consequences of a barren record, claimed that it had been denied the discovery that would allow it to uncover evidence of HCFA's funding of other WMS-type projects. As the district court pointed out, New York did not present arguments (or seek information) during the hearing before DAB concerning the Secretary's practice in other states. See New York Dep't of Social Services, 811 F.Supp. at 977 n. 18. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); see also Franklin County Employment and Training Admin. v. Donovan, 707 F.2d 41, 44-45 (2d Cir.1983) (as a general rule, "all issues which a party contests on appeal must be raised at the appropriate time under agency practice"). "If the record before the agency does not support the agency action ... or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course ... is to remand to the agency for additional investigation or explanation." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). However, so long as the administrative record supports the conclusions reached below, and that record is sufficient to determine the reasonableness of the agency's action (as it is here), we will not reopen agency proceedings to allow litigants to plow new ground.
 
 
 49
 On direct examination before the Board, a witness for HCFA stated that the incremental approval process was used for the MMIS in New York City, for the MMIS and the WMS in upstate New York, and "[i]t was also the process that was employed in one other State, and that was California." This statement is ambiguous as to whether the incremental process in California applied to its MMIS, WMS, or both. However, any confusion was dispelled shortly thereafter:
 
 
 50
 Q: ... Has any other state ever even asked you to approve their Integrated Eligibility System incrementally?
 
 
 51
 A: To the best of my knowledge, none has.
 
 
 52
 Q: So, the upstate WMS is really the exception to the rule.
 
 
 53
 A: I would say so.
 
 
 54
 New York advanced no challenge to this testimony, by cross-examination or otherwise; nor does the record reflect inquiry by New York concerning the funding of WMS-type projects outside New York. Assuming without deciding that this issue would furnish New York with a valid ground for challenging the Secretary's method of payment for the NYC/WMS, we agree with the district court's conclusion:
 
 
 55
 To allow New York to raise this issue for the first time in this court would eviscerate the finality of DAB's determination in this case, and would encourage others not to litigate legal and factual issues in the first instance before the DAB.... In sum, we find the record developed before the Secretary sufficient to support the Secretary's funding decisions, and that neither discovery nor remand to HHS is warranted in this case.
 
 
 56
 New York Dep't of Social Services, 811 F.Supp. at 977 n. 18.
 
 
 57
 New York also argues that HCFA's application of the transition funding policy to the NYC/WMS was arbitrary and capricious because (1) the transition funding policy is inapplicable to the NYC/WMS as an independent system; and (2) even if the NYC/WMS were subject to the transition funding policy, it became fully operational before all 92 sites were operating. These arguments attack HCFA's interpretation of its own regulations, an interpretation to which we owe special deference. See Martin v. OSHRC, 499 U.S. 144, 151, 111 S.Ct. 1171, 1176, 113 L.Ed.2d 117 (1991) ("Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated law-making powers."); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (deference is "even more clearly in order" when an agency construes its own regulations than when it interprets statutes).
 
 
 58
 Simply stated, New York's complaint is that HCFA has focussed on the wrong unit in defining "the complete system." The transition funding policy provides 50% FFP "for operation of any subsystem from that point that 90% FFP ceases until the complete system is fully operational." First, New York argues that, because the NYC/WMS is not technically a subsystem of the MMIS, the 50% rate cannot apply to the NYC/WMS as a separate system. New York would require HCFA to define "the complete system" as "the MMIS as enhanced by the NYC/WMS," and require 75% FFP for an operating WMS site so long as the MMIS itself is fully operational. Second, New York argues that, even if the transition funding policy applies to the NYC/WMS, each site is fully operational before citywide implementation. We find neither argument persuasive. As we have already noted, the record discloses some benefits that could be realized only after all 92 sites are operational. Moreover, HCFA agreed to fund one citywide system of WMS sites, not 92 separate WMS units. This being so, it is reasonable for the Secretary to refuse to treat a single operating WMS site in the same way as the fully operational NYC/WMS. Even if New York were able to persuade us to accept their definition of "complete system," the MMIS as enhanced by fewer than 92 WMS sites would not necessarily be entitled to 75% FFP as a fully operational system. As the district court concluded,
 
 
 59
 New York did not propose, nor did the Secretary agree to fund, some working fractional portion of the WMS/NYC "whether or not installation was complete at all sites Citywide." Plaintiff's Memorandum in Support of its Motion for Summary Judgment at 24. Rather, New York proposed in the APD, and the Secretary only agreed to fund, an integrated, citywide system which would confer benefits on New York's administration of the Medicaid program.
 
 
 60
 New York Dep't of Social Services, 811 F.Supp. at 977. Whether or not it would also be reasonable for HCFA to have provided 75% FFP to each WMS site as each began operation, HCFA's decision to withhold that level of funding until all 92 sites were in operation was not arbitrary and capricious.C. APA Notice and Comment Procedures
 
 
 61
 Finally, New York argues that the transition funding policy cannot be enforced against it because the Secretary did not follow the proper procedures in promulgating that policy as a rule. We disagree.
 
 
 62
 The Secretary published a Notice of Proposed Rulemaking ("NPRM") in the Federal Register, see 48 Fed.Reg. 9038 (Mar. 3, 1983), which requested comments "on all of Part 11 of the SMM, which now contains all the conditions for initial approval and annual reapproval of MMIS." A summary of the transition funding policy was set out in a section of the NPRM entitled "Major Provisions of the Regulations." Id. at 9040. This disclosure satisfied the APA requirement that a NPRM include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. Sec. 553(b)(3). The summary stated:
 
 
 63
 When system operation begins, the State receives 50 percent FFP in its expenditures for system operation until the system is approved. The FFP in State expenditures increases to 75 percent, effective with the first day of the calendar quarter after the system was determined to be operating satisfactorily. This 75 percent rate may be given retroactive effect if we determine the system to have been operational for an entire calendar quarter before the quarter in which the system received its initial approval.
 
 
 64
 48 Fed.Reg. at 9040. This description, coupled with the reference to Part 11 of the SMM, was sufficient notice that the Secretary was proposing the transition funding policy as a regulation. Section 553(b)(3) does not require "a precise notice of each aspect of the regulations eventually adopted" so long as it "affords interested parties a reasonable opportunity to participate in the rulemaking process." Forester v. Consumer Product Safety Comm'n, 559 F.2d 774, 787 (D.C.Cir.1977).
 
 
 65
 In addition, even if there were some procedural defect in the Secretary's promulgation, New York had ample actual notice that HCFA intended to fund the NYC/WMS according to the procedure set out in the transition funding policy. New York received a copy of the text of the policy prior to the publication of the NPRM in the Federal Register. See 48 Fed.Reg. at 9040 ("States have already been provided with copies of Part 11."). Publication of the NPRM is not required if those subject to the proposed rule otherwise have actual notice. See 5 U.S.C. Sec. 553(b) ("General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto ... have actual notice thereof in accordance with law."); see also id. Sec. 552(a)(1) ("Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."). New York was undeniably aware that HCFA intended to pay 50% FFP for partial operation of the NYC/WMS. The negotiations concerning the NYC/WMS reveal that, although New York never expressly withdrew its request for reimbursement at a higher rate of FFP, HCFA explicitly conditioned approval of the system on New York's acceptance of 50% operational FFP until citywide implementation was complete. New York accepted HCFA's conditions by proceeding with the implementation of the NYC/WMS. Having failed to show that HCFA's application of the transition funding policy in this situation was arbitrary and capricious, New York should not complain that HCFA is enforcing its end of the bargain by paying no more than it agreed to pay.
 
 CONCLUSION
 
 66
 For the reasons stated above, the judgment of the district court is affirmed.