**The STATE OF NEW YORK and the New York State Department of Social Services, Plaintiffs,**

v.

**Donna E. SHALALA, as Secretary of the United States Department of Health and Human Services, Shirley Chater, as Commissioner of the United States Social Security Administration, and Franklin D. Raines, as Director of the Office of Management and Budget, Defendants.**

No. 95 Civ. 10259(SAS).

United States District Court, S.D. New York.

July 10, 1997.

Mary Fisher Bernet, Assistant Attorney General, Office of the Attorney General of the State of New York, New York City, for Plaintiffs.

Jonathan A. Willens, Asst. U.S. Atty., Southern Dist. of New York, New York City, for Defendants.

## MEMORANDUM OPINION

SCHEINDLIN, District Judge.

Plaintiffs New York State Department of Social Services ("NYSDSS") and the State of New York (collectively "the State" or "Plaintiffs") appeal from several decisions of the Departmental Appeals Board ("DAB") of the United States Department of Health and Human Services ("HHS"). Plaintiffs seek judicial review of HHS's denial of federal reimbursement for the expense of building space used by the State to administer several social service programs that are partly funded by the federal government. Plaintiffs now move

for summary judgment on their appeals of the DAB decisions denying them reimbursement for their building space claims. Defendants cross-move for summary judgment on these same decisions. For the reasons stated below, Plaintiffs' motion is denied, and Defendants' motion is granted.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

The disallowed administrative costs at issue in this action involve twelve federal public assistance programs that provide a variety of services to low income people. A full explanation of the facts is found in this Court's previous Opinion, *State of New York v. Shalala*, 95 Civ. 10259, 1997 WL 73574, at *1–2 (S.D.N.Y. Feb.19, 1997). Familiarity with that opinion is presumed. NYSDSS is responsible, *inter alia*, for administering and supervising federal public assistance programs. *See* Soc. Serv. Laws § 20. Its duties include filing and pursuing claims for federal reimbursement of the State's administrative costs incurred in running these programs. Defendant HHS administers many of these program, at the federal level, with the exception of the SSD and SSI programs, which are administered by the Social Security Administration ("SSA"). SSA processes state claims for reimbursement under those programs. *See* 42 U.S.C. §§ 421(e) and 1383(a).

HHS and SSA have specific authority to determine what costs are "necessary" for the proper and efficient administration of the programs they run. *See, e.g.*, 42 U.S.C. § 1396b(a)(7) (Medicaid). After a determination that a cost is necessary, HHS and SSA decide whether all components of that necessary cost are "allowable." This decision is based on Office of Management and Budget ("OMB") Circular A–87 (the "Circular"), which sets forth cost principles for federal grants to State and local governments. The Circular has the force of a regulation and is incorporated by reference at 45 C.F.R. § 74.27(a). In addition to describing general cost principles, the Circular delineates specific costs that are unallowable under federal grants. The provision of the Circular under which the costs at issue in this case were disallowed currently provides in relevant part:

*Interest and other financial costs.* Interest on borrowings (however represented), bond discounts, cost of financing and refinancing operations, and legal and professional fees paid in connection therewith, are unallowable except when authorized by Federal legislation.

OMB A–87, Attachment ("Att.") B, § D.7. Prior to 1980, the Circular also provided that "[t]he rental cost of space in a privately-owned building is allowable." A–87, Att. B, § C.2.a. The provision was amended in 1980 to allow "[s]imilar costs for publicly owned buildings newly occupied on or after October 1, 1980." *See* 45 Fed.Reg. 27363 (1980).

### B. The Appeals

The administrative decisions appealed here involve lease costs for the NYSDSS headquarters building in Albany, New York during the period from fiscal year 1977 through fiscal year 1989. The Urban Development Corporation ["UDC"] arranged for construction between 1974 and 1976 of the Ten Eyck Building, located at 40 North Pearl Street, Albany, New York. Construction was financed through tax-free bonds. On April 15, 1974, UDC leased space in the Ten Eyck Building to the New York State Office of General Services ("OGS") pursuant to a forty-year lease-purchase contract. Plaintiffs' Local Rule 3(g) Statement ¶¶ 7, 10, and 12. Rental costs were computed on the basis of development costs, interest on the bonds, appropriate maintenance and insurance costs, and payments in lieu of taxes. OGS assigned space to Plaintiffs who have occupied it since December 1976. OGS reports the cost of the space to NYSDSS which in turn claims federal reimbursement. Between April 1977 and March 1995, HHS reimbursed the State for building costs, including interest costs on the lease-purchase contract for the Ten Eyck Building on an annual basis. In 1995, HHS issued five disallowances for these interest costs, totaling $9,473,649. *Id.* at ¶ 32.

The State filed a timely appeal of each disallowance, first to the HHS Division of Cost Allocation Regional Director ("DCA"),

and then to the DAB. The DAB upheld the disallowances and ruled that the State could only claim costs of building space based on a use allowance computed at two percent of construction costs and excluding interest costs on the bonds used to finance construction. The State now appeals on several related grounds, arguing that Defendants' policy against paying interest costs for the acquisition of building space violates applicable statutes and that the Ten Eyck Building space costs are reimbursable pursuant to the Circular.

### C. Standard of Review

This court may set aside decisions of the Board only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Furthermore, an agency's interpretation of a statute that it is charged to administer should be followed " 'unless there are compelling indications that it is wrong.' " *Weeks v. Quinlan*, 838 F.2d 41, 43 (2d Cir.1988)(quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)).

## II. DISCUSSION

### A. DID HHS'S APPLICATION OF OMB A–87, PROHIBITING FEDERAL REIMBURSEMENT OF NEW YORK'S INTEREST COSTS, VIOLATE FEDERAL LAW?

▉ In my February 19, 1997 Opinion, I held that OMB had the authority to issue the government-wide cost principles embodied in the Circular, and that HHS's adoption of the Circular was valid and enforceable. *State of New York*, 1997 WL 73574, at *4. There is no need to revisit those conclusions. Plaintiffs now argue that HHS improperly extended A–87 to bar reimbursement of interest on the Ten Eyck Building—an argument reject-

ed by the DAB. DAB Decision No. 1336 at 1. The State contends that OMB's authority to issue these principles does not extend to real property because the 1974 Office of Federal Procurement Policy Act ("OFPPA"), 41 U.S.C. § 405(a)(1), excludes real property from the types of procurement for which OMB may issue guidance to other federal agencies. Memorandum of Law In Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mem.") at 11.

In 1974, Congress established the Office of Federal Procurement Policy ("OFPP") within OMB. Congress did so "to promote economy, efficiency, and effectiveness in the procurement of property and services by the executive branch of the Federal Government through a variety of measures." 41 U.S.C. § 401. At the head of OFPP is an Administrator (colloquially known as the "FAR Czar" for overseeing the Federal Acquisitions Register) who:

> shall provide overall direction of procurement policy and leadership in the developments of procurement systems of the executive agencies.[1] To the extent that the Administrator considers appropriate, in carrying out the policies and functions set forth in this chapter, and with due regard for applicable laws and the program activities of the executive agencies, the Administrator may prescribe Government-wide procurement policies which shall be implemented in the single system of Government-wide procurement regulations and shall be followed by executive agencies in the procurement of—(1) property other than real property in being. . . .

OFPPA, 41 U.S.C. § 405(a).

Plaintiff argues that the OFPPA bars OMB from issuing guidelines for the procurement of real property. The OFPPA does address the scope of authority of the OFPP, and in particular bars the OFPP from issuing guidance as to the procurement of real property. That office, however, is merely a component office within the OMB. A limitation on the OFPP's authority has no

---

1. "Executive Agency" means "(A) an executive department specified in § 101 of Title 5; (B) a military department specified in § 102 of such Title; (C) an independent establishment as de-

fined in § 104(1) of such Title; and (D) a wholly owned Government corporation fully subject to the provisions of chapter 91 of Title 31." 41 U.S.C. § 403.

bearing on the authority of OMB. In fact, 41 U.S.C. § 405(h) reads in relevant part, "[n]othing in this chapter shall be construed to .... (2) limit the current authorities of the Director of the Office of Management and Budget." Plaintiff does not contend that the Director of OMB faces any restriction as to issuing guidance regarding the procurement of real property. OFPPA did not limit OMB's authority to issue the Circular, nor does the Act affect the Circular's terms. Thus, the application of OMB A–87 does not violate the OFPPA.

## B. HAS HHS CORRECTLY DETERMINED THAT INTEREST EXPENSES RELATING TO THE TEN EYCK BUILDING ARE NOT ALLOWABLE UNDER OMB A–87?

In reviewing an agency's construction of a statute, the threshold question is whether Congress has addressed the precise question at issue. *State of New York Department of Social Services v. Shalala,* 21 F.3d 485, 491 (2d Cir.1994). If Congress has done so, a reviewing court must "give effect to Congress's expressed intent." *Id.* (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). When a statute is silent or ambiguous, a court must defer to the agency's interpretation of the statute if that interpretation is based on a permissible construction of the statute and is sufficiently reasonable. *Id.* at 844–45, 104 S.Ct. at 2782–83.[2]

As amended, the Circular permits reimbursement of interest costs relating to the rental of building space only "if the lease is either (a) with a private landlord or (b) for space in publicly-owned buildings which are first occupied after October 1, 1980." OMB A–87, Att. B, § C.2. Plaintiff attacks the DAB's ruling on several grounds, arguing that: (1) the building is privately-owned; (2) the pre–1980 distinction between public and private was unreasonable; (3) the use of an occupancy date cutoff was unreasonable; and (4) that the 1980 extension of reimbursement for publicly-owned buildings should be applied retroactively.

### 1. Is the Ten Eyck Building publicly or privately owned?

■ The State contends that the Ten Eyck Building is privately owned, making rental space reimbursable under the version of the Circular in force between 1973 and 1981. As noted above, the building is owned by the Urban Development Corporation ("UDC") and leased to the State through the State Office of General Services ("OGS"). NYSDSS occupied the Ten Eyck space in 1976. As part of the rental costs, the State also pays interest on the forty-year public bonds issued in 1974 to finance the building. When the bonds are paid off, the UDC will transfer its ownership of the building to the State.

The Circular does not itself define public or private ownership. However, both the laws of New York State and the courts have consistently defined the UDC as a public entity. Section 6254(1) of the New York Unconsolidated Laws includes the following language: "There is hereby created the New York State Urban Development Corporation. The Corporation shall be a corporate governmental agency of the state, constituting a

**2.** "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, n. 30, 107 S.Ct. 1207, 1221, n. 30, 94 L.Ed.2d 434 (1987). In *INS,* the Court rejected the agency's request for a heightened standard of deference based on that agency's changing interpretation of a particular regulation over time. Here, Plaintiff argues for less deference to HHS's discretion based on purported changes or inconsistencies in the agency's policy. Plaintiff alleges that the HHS twice changed interpretations of the regulations concerning reimbursement of interest costs on building leases, i.e. once after the 1973 adoption of A–87 and again in 1981 after the revision of the Circular.

Plaintiffs' argument is based on a faulty premise. In adopting OMB A–87 and then revising it, HHS changed the text of the regulation itself, not its interpretation of the regulation. Moreover, the Court of Appeals has rejected the argument that an agency's new interpretation is not entitled to deference even where the agency has changed its position. *See Himes v. Shalala,* 999 F.2d 684, 690 (2d Cir.1993) ("An inconsistent position alone is not enough to require this Court to give less deference to the Secretary's definition.").

political subdivision and public benefit corporation." *See also Cine 42nd Street Theater Corp. v. Nederlander Org.,* 790 F.2d 1032, 1035 (2d Cir.1986) (the UDC is "a corporate governmental agency of the state, constituting a political subdivision and public benefit corporation."). Courts interpreting § 6254(1) have concluded that while the UDC is distinguishable from the State, it is still a public rather than private entity. *U.S. v. Yonkers,* 880 F.Supp. 212, 244–45 (S.D.N.Y. 1995) ("the UDC is the legal equivalent of a municipality."). The Ten Eyck Building has been owned by the UDC since it was first occupied in 1976. Therefore, the DAB was correct to reject Plaintiffs' characterization of the Ten Eyck Building as privately owned.

### 2. Was the distinction between public and private buildings reasonable?

■ Plaintiffs next argue that the distinction between public and private buildings was never a reasonable basis for determining whether interest is reimbursable. Plaintiffs claim this policy is arbitrary and capricious because it results in denial of reimbursement only for publicly-owned buildings first occupied between 1968 and 1980.

The general policy underlying the Circular is to ensure that federally assisted programs "bear their fair share of costs ... except where restricted or prohibited by law. No provision for profit or other increment above cost is intended." A–87, Att. A, § A.1. Prior to 1980, HHS distinguished between public and private ownership to prevent a state from making a profit from "renting" space from itself in buildings it already owned, and then charging HHS for the cost. The distinction aimed to discourage states from creating "sham" leases that would "obscur[e] the reality of State ownership." DAB Decision No. 1336 at 5. States were entitled to reimbursement for the genuine cost of leasing or renting from a private vendor. A–87, Att. A, § A.1.

As applied here, the State notes that rather than saving HHS money, adherence to this regulation costs HHS money, because the State's lease with UDC was cost effective and did not result in a profit to the state. Even if these assertions are true, as I previously held, "HHS must promulgate regulations that apply to many different agencies, in several contexts. General application is an essential attribute of regulations." *State of New York,* 1997 WL 73574, at *6, n. 8. Because HHS may pay more money in this instance does not negate the presumptive reasonableness of the regulation or of its application. The pre–1980 distinction between public and private ownership, as applied by Defendants to the Ten Eyck Building, was reasonable.

### 3. Is the October 1980 Occupancy Requirement reasonable?

■ The change in October 1980 that allowed reimbursement of interest on rental costs of publicly-owned buildings was not retroactive; the enhanced reimbursements applied only to publicly owned buildings initially occupied after October 1980. Plaintiffs first argue that it was unreasonable for HHS to choose "date of occupancy" as the operative date for reimbursement purposes. Instead, Plaintiffs contend that the HHS should have permitted reimbursement of *all* interest costs accrued after October 1, 1980 on *all* buildings rather than limiting reimbursement only to buildings *occupied* after that date. Plaintiffs complain that occupancy date is not used for other types of reimbursement, and therefore that it is arbitrary and unreasonable.

I do not find occupancy date to be an unreasonable limitation on reimbursement of interest costs for buildings. First, for public buildings occupied prior to 1980, when the regulation was passed, a grantee had no reason to contract with HHS with this form of reimbursement in mind. Only those grantees who occupied public buildings subsequent to its passage have been induced to reasonably rely on this reimbursement.[3] Therefore, I find that the use of a occupancy date was a reasonable means of applying the regulation prospectively. Although the State

---

**3.** The DAB also concluded that the State did not, in fact, mistakenly rely on future reimbursement of its rental costs for the Ten Eyck Building, as the State did not develop any rental rate system for the Building that was based on actual costs, as required by the regulation. Rather, the State based its calculations on fair market rental rates obtained from OGS.

contends that other bases for reimbursement would be more reasonable, *e.g.* the quarter in which the expense was recorded in state accounting records, the agency's decision need not be the most reasonable as long as it is not arbitrary and capricious.

### 4. Should the change in the lease provision have been retroactive?

■ The State next argues that HHS's failure to extend this benefit retroactively was unfair and irrational. Plaintiffs contend that the factors outlined in *New York Telephone Co. v. F.C.C.*, 631 F.2d 1059, 1068 (2d Cir.1980), are those a court should use "for determining whether an administrative policy should be applied retroactively." Plaintiffs simply misconstrue *New York Telephone.* That case established factors that a court should use to determine if an agency may issue an administrative policy retroactively, if the agency chooses to do so. *Id.* at 1067–68. The fact that in some instances a reviewing court may permit an agency to apply changes retroactively does not mean that an agency would otherwise be obliged to apply that change retroactively. *New York Telephone* does not require a court to compel the agency to make a retroactive change.

With respect to retroactivity, the DAB found that

> [t]he establishment of a clear cut-off date promoted certainty, prevented efforts to reopen innumerable prior claims on state buildings, avoided windfalls to states which had no reason to anticipate such additional recovery before the revision, and encouraged states to move operations from private to public facilities (rather than simply mortgaging existing property).

DAB Decision No. 1336 at 13 (citing 45 Fed. Reg. 27,363). These reasons are neither irrational nor unreasonable. In fact, they are eminently sensible. As such, I decline to set aside the DAB's ruling with respect to retroactivity.

### C. ARE THE STATE'S INTEREST COSTS FOR THE TEN EYCK BUILDING REIMBURSABLE UNDER THE LEASE PURCHASE PROVISION OF OMB A–87?

■ Section C.2.e of OMB A–87's Attachment B provides for reimbursement of state grantees' costs of acquiring building space by lease-option-to-purchase or rental-purchase. This provision reads in full: *"Occupancy of space under rental-purchase or lease option-to-purchase agreement.* The cost of space procured under such arrangements is allowable when specifically approved by the Federal grantor agency [here HHS]." This section falls under the category of "[C]osts allowable with approval of grantor agency." The other types of costs that may be approved are listed by section: 1) automatic data processing; 2) building space and related facilities; 2a) rental cost; 2b) maintenance and operation; 2c) rearrangement and alterations; 2d) depreciation and use allowance in publicly owned buildings; 3) capital expenditures; and various forms of 4) insurance and indemnification.

Section C.2.e does not limit reimbursement to privately-owned buildings. Plaintiffs contend that because they leased the Ten Eyck Building, they should be reimbursed for interest costs even if the Ten Eyck Building is found to be publicly-owned. The DAB held that § C.2.e is inapplicable here because the State already owns the Ten Eyck Building and therefore is not renting it. In so finding, the DAB ruled that the UDC and the State's interests were so closely aligned that they could not be said to have engaged in the type of arms' length negotiation over building space required to satisfy the rental-purchase or the lease component of this section. While this may be so, it is irrelevant. The State clearly fails to establish a critical requirement for reimbursement under § C.2.e—approval by HHS.

The DAB found that Plaintiffs had neither sought nor received specific approval from HHS for the Ten Eyck Building lease. While essentially conceding that HHS did not approve the actual cost of leasing the Ten Eyck Building, *see* Pls.' Mem. at 25, Plaintiffs claimed before the DAB and again on this appeal that the State did not need explicit approval because its Cost Allocation Plans ("CAPs"), which disclose some costs attributable to the use of the Ten Eyck building, had been approved annually by HHS. In other

words, the State contends that because HHS approved the procedures to allocate costs among the various agencies using the Ten Eyck space, the lease agreement for the space itself was also approved.

This "implicit" approval method proposed by the State makes no sense, particularly in light of § C.2.e's requirement that specific approval be sought and obtained for all lease-option-to-purchase agreements on building space.[4] Implicit approval does not qualify as specific approval. I therefore uphold the DAB's finding that the State did not obtain approval for the Ten Eyck building lease.[5]

### D. REIMBURSEMENT UNDER THE HANDBOOK FOR PUBLIC ASSISTANCE

The State also contends that section 4532.5 of the Handbook for Public Assistance ("Handbook") required reimbursement of interest costs relating to the use of public buildings from 1963, when it was issued, until the 1980 revision of OMB A–87.[6] This section permitted acceleration of depreciation claims up to 75 percent of comparable private rental rates, or higher than 75 percent with approval from HHS.[7] The DAB rejected Plaintiffs' reliance on the Handbook for two reasons: first, because it found that section 4532.5 does not apply, and second, because

OMB A–87 superseded the Handbook when it was issued in 1973 insofar as there was any conflict in their provisions.

■ The DAB concluded that the State misinterpreted section 4532.5, in large part because this section "uses comparable rental only as a benchmark for accelerating depreciation recovery." See DAB Decision No. 1336 at 16. Plaintiff extracts a portion of this lengthy directive—"Federal financial, participation … might include the interest on monies secured from public or private sources"—and attempts to divorce it entirely from its context—claims for accelerated depreciation. Plaintiffs' only explanation for this novel method of interpretation is that "the Handbook's reference to the accelerated claiming method is on a different page … from the interest provision … and does not even refer to it." Pls.' Mem. at 8. This is silly. The interest costs reimbursable under section 4532.5 are inextricably connected to a claim for accelerated depreciation, which the State did not claim for the Ten Eyck Building.

■ The DAB also found that in 1973 the Circular superseded section 4532.5 insofar as there was any conflict between their respective provisions. The DAB found that the Circular plainly states that its content is

4. The DAB was not convinced that the lease agreement between UDC and the State could even be treated as a lease-option-to-purchase agreement, in part because the UDC is not a private vendor. See DAB Decision No. 1336 at 6.

5. I also reject the State's argument that it relied on HHS's approval of its CAPs as "specific approval." As Defendants point out, the State offers no support for the State's contention that approval of a CAP that does not specifically address a cost item such as the lease involved here overrides the no-interest rule set forth in the Circular and the regulation. In fact, the Circular put the State on notice that precisely this type of cost would not be reimbursed without prior approval.

6. The Handbook was initially issued by HHS's predecessor agency, the Department of Health, Education and Welfare in 1963. The Handbook provided guidance to state agencies in their administration of federal public assistance programs. The version upon which Plaintiffs rely is dated December 31, 1963. R. 394—396.

7. Section 4532.5, which appears in Part V, Fiscal Operations and Accountability, provided in relevant part:

*Rental Charges Based on the Initial Cost of Construction or Purchase of Publicly Owned Buildings* Federal financial participation ["FFP"] is available in rental charges based on the initial cost of construction or purchase of publicly owned buildings … Ordinarily the costs of initial construction or purchase are spread over the life of the building. For purposes of [FFP], however, such charges may be spread in relation to the comparable rental…. Under certain circumstances, [FFP] is available in other expenses as part of the cost of a project for the construction or purchase of a publicly owned building. These expenses might include interest on monies secured from private or public sources to be used in the financing of the building…. All rental charges for the initial cost of construction or purchase of publicly owned buildings … not exceeding 75 percent of the lowest appraisal of the comparable rental, may be approved by the State agency under standards in its approved plan providing for such approval….

government-wide, and that its purpose, in part, is to promote "a uniform approach to the problem of determining costs." DAB Decision No. 1336 at 17; 38 Fed.Reg. 26,275; OMB A–87, ¶ 4. Plaintiffs assert that because HHS has stated that the pre–1980 version of the Circular was "silent about rental charges for space in publicly owned buildings," 44 Fed.Reg. 37707 (June 28, 1979), section 4532.5 was not superseded by OMB A–87 because they were not inconsistent. While this argument has a superficial appeal, it does not withstand closer scrutiny. First, OMB A–87 provides detailed methods for calculating the cost of building space used by the State in administering federal programs. The equally detailed provision, of section 4532.5 concerning building space were therefore preempted in their entirety by the Circular. Second, had section 4532.5 remained in effect after the adoption of the Circular in 1973, the 1980 amendment expanding the rental cost provision to newly occupied publicly owned buildings would have been an empty gesture. HHS engaged in notice and comment rulemaking with respect to this change precisely because it was a *change* in the regulation, not a continuation of existing policy. The DAB's rejection of Plaintiffs' reliance on the Handbook was therefore neither arbitrary nor capricious.

## III. CONCLUSION

The State has failed to show that federal law requires the federal government to reimburse the State for the interest costs disallowed by HHS. The DAB properly concluded that the interest expenses claimed by the State were not allowable under §§ C.2.a. or C.2.e. of OMB A–87, or under the Handbook. Because DAB Decision Nos. 1336, 1377, 1445, 1506, and 1590 were not arbitrary, capricious, or otherwise not in accordance with federal law, the State's motion for summary judgment on its appeals of those Decisions are denied. The Defendants' cross-motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment in favor of Defendants.

SO ORDERED.