**MILK INDUSTRY FOUNDATION,**
Appellant,

v.

**Daniel R. GLICKMAN, Secretary, United States Department of Agriculture and Northeast Dairy Compact Commission, Appellees.**

No. 97–5163.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 20, 1997.

Decided Jan. 20, 1998.

Steven J. Rosenbaum argued the cause for appellant, with whom Jonathon C. Drimmer and Jason A. Levine, Washington, DC, were on the briefs.

Douglas N. Letter, Appellate Litigation Counsel, U.S. Department of Justice, Washington, DC, argued the cause for appellee Daniel R. Glickman, Secretary, United States Department of Agriculture, with whom Frank W. Hunger, Assistant Attorney General, Washington, DC, Mary Lou Leary, U.S. Attorney, and Stephen W. Preston, Deputy Assistant Attorney General, U.S. Department of Justice, Washington, DC, were on the brief.

Clifford M. Sloan, Washington, DC, argued the cause for appellee Northeast Dairy Compact Commission, with whom Michael A. Rotker, Washington, DC, was on the brief.

Paul A. Strandberg, Assistant Attorney General, State of Minnesota, St. Paul, MN, was on the brief for amici curiae States of Minnesota, Wisconsin, and South Dakota.

Emily J. Gould, Assistant Attorney General, State of Vermont, was on the brief for amici curiae State of Connecticut, et al.

Eric Rome was on the brief for amici curiae Public Voice for Food and Health Policy, et al.

Roy J. Rodney, Jr., New Orleans, LA, and Endya E. Delpit were on the brief for amici curiae Commissioners of the Louisiana, Arkansas, Georgia, South Carolina and West Virginia Departments of Agriculture.

Before: EDWARDS, Chief Judge, HENDERSON, and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Concurring opinion filed by Circuit Judge ROGERS with whom Circuit Judge HENDERSON concurs.

EDWARDS, Chief Judge:

In 1993, the six New England states—Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont ("Compact states")—agreed to form the Northeast Interstate Dairy Compact ("Compact") to enable them to raise the minimum milk prices that dairy processors must pay to dairy farmers in their region for milk processed and consumed in fluid form ("farmgate prices"). The Constitution provides that "[n]o State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State...." U.S. CONST. art. I, § 10, cl. 3 ("compact consent clause"). Congress purported to consent to the Compact with the passage of the Federal Agricultural Improvement and Reform Act of 1996 ("FAIRA") § 147, 7 U.S.C. § 7256 (Supp.1996). Congress conditioned its consent on a finding of a "compelling public

interest" by the Secretary of Agriculture ("Secretary").

Appellant, the Milk Industry Foundation, contends that Congress did not "consent" to the Compact but instead impermissibly delegated this constitutional responsibility to the Secretary. Appellant also claims that even assuming, *arguendo*, that the delegation was lawful, the Secretary exercised his delegated authority arbitrarily and capriciously in violation of the Administrative Procedure Act ("APA").

The congressional action here is not substantially different from countless pieces of contingent legislation enacted by Congress over the last few decades—including many that have been challenged and upheld by the courts. Appellant asserts that the instant delegation is somehow different because it involves an interstate compact. This claim is meritless. Furthermore, we have no doubt that, in instructing the Secretary to authorize the Compact only upon finding a "compelling public interest in the Compact region," Congress provided an "intelligible principle" to guide the Secretary's exercise of the delegated power. Accordingly, we hold that the delegation is constitutional.

We also reject Appellant's APA claim. Evaluating the Secretary's finding of a "compelling public interest" within the relevant context at issue, we find that he "examine[d] the relevant data and articulate[d] a satisfactory explanation for [his] action[,] including a rational connection between the facts found and the choice made." Thus his decision is not arbitrary and capricious under the APA. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (internal quotations omitted).

## I. BACKGROUND

### A. *The National Scheme for the Regulation of Milk Prices*

Congress initiated the federal program for the regulation of farm-gate milk prices with the passage of the Agricultural Marketing Agreement Act of 1937 ("AMAA"). § 2, 7 U.S.C. §§ 601–624, 671–674 (1994). The AMAA delegates the authority to set mini-mum milk prices nationwide to the Secretary, § 608c(18), while the states retain authority to establish milk prices above the federal price floor. *See United Dairy Farmers Coop. Ass'n v. Milk Control Comm'n of Pennsylvania*, 335 F.Supp. 1008, 1013–15 (M.D.Pa.) (three judge court), *aff'd without opinion*, 404 U.S. 930, 92 S.Ct. 280, 30 L.Ed.2d 244 (1971).

### B. *The Northeast Interstate Dairy Compact*

In 1988, Vermont initiated an effort to regulate milk prices beyond its own state borders by forming an interstate compact with neighboring states. By 1993, all of the New England state legislatures had approved the formation of the Northeast Interstate Dairy Compact, and all of the states' governors had signed resolutions supporting it. *See Milk Indus. Found. v. Glickman*, 949 F.Supp. 882, 885 (D.D.C.1996) ("*MIF I*") (explaining history of Compact). A principal objective of the Compact is to preserve dairy farms in the Compact states. *See* Compact art. I, § 1, *reprinted in* Appendix to Brief for Appellee Northeast Dairy Compact Commission. The Compact states agreed to establish a Commission consisting of three to five representatives from each state, with at least one person from each state being a dairy farmer and another a consumer representative, to administer the Compact. Compact art. III, § 4.

The Compact grants the Commission authority to, among other things, establish an "over-order" farm-gate price, a price of up to $1.50 per gallon over the federal minimum price for milk used for fluid products. Compact art. IV, § 9. The Compact's voting requirements are designed to ensure that the Commission does not pass any over-order prices without the broad consensus of the Compact states, both dairy-producing and dairy-consuming states. *See* Compact art. III, § 5 (requiring at least two-thirds vote of the delegations present to establish or terminate an over-order price); *id.* ("The establishment of a regulated area which covers all or part of a participating state shall require also the affirmative vote of that state's delegation.").

### C. *Congress' Consent to the Compact*

Congress consented to the Compact with the enactment of FAIRA § 147, 7 U.S.C. § 7256 (Supp.1996). *See MIF I*, 949 F.Supp. at 886–87 (detailing efforts to obtain congressional consent to the compact). Congress' consent to the Compact was made subject to a number of conditions and limitations, two of which are relevant here. First, Congress conditioned its consent on a finding by the Secretary that the implementation of the Compact is in the compelling public interest of the Compact region. § 7256. ("Based upon a finding by the Secretary of a compelling public interest in the Compact region, the Secretary may grant the States that have ratified the Northeast Interstate Dairy Compact ... the authority to implement the [ ] Compact."). Second, Congress limited the duration of its consent to the Compact, providing for its termination upon the Secretary's implementation of comprehensive reforms of the federal scheme for regulating milk prices mandated by FAIRA. *See id.* (providing that Congress' consent "shall terminate concurrent with the Secretary's implementation" of pending reforms to the federal milk-pricing scheme); *see also* 7 U.S.C. § 7253 (Supp.1996) (mandating the consolidation and reform of the federal milk-pricing scheme not later than April 4, 1999).

### D. *The Secretary's Findings and Appellant's Challenges to the Compact*

On August 28, 1996, the Secretary published a two-sentence finding of a compelling public interest and authorized the Compact states to implement the Compact. 61 Fed. Reg. 44,290 (1996) ("Initial Finding"). Appellant promptly filed a motion in the District Court for the District of Columbia for a preliminary injunction to bar the implementation of the Compact, claiming that section 147 of FAIRA was an unconstitutional delegation of legislative power and that the Secretary had exercised his delegated authority arbitrarily and capriciously in violation of the APA.

Following the District Court's denial of Appellant's motion for a preliminary injunction, the Secretary moved to stay proceedings so that he could review the entire administrative record and provide an amplified decision justifying his finding of a compelling public interest. The District Court granted this motion, instructing the Secretary to hold open the possibility of reaching a contrary conclusion upon reexamination of the record. *Milk Indus. Found. v. Glickman*, 955 F.Supp. 8, 9 (D.D.C.1997).

The Secretary issued a second decision on March 28, 1997, again finding a compelling public interest in the Compact region warranting authorization of the Compact. 62 Fed.Reg. 14,879 (1997) ("Amplified Decision"). In reaching his decision, the Secretary emphasized the importance of taking "reasonable measures to preserve small family farms," noting that "America wants and still needs the family farm. This belief is obviously strongly held by the people of the Compact region." *Id.* at 14,879–80 (finding that "small dairy farms are an essential part of the character and culture in the Compact region"). The Secretary also noted that the Compact is a short-term measure which will expire upon the completion of the pending reform of the federal milk-pricing scheme. *Id.* at 14,880. The Secretary found that the Compact likely would result in higher milk prices and therefore, at least in the short-term, provide higher profitability for, and decrease financial pressures on, family-sized dairy farms in New England. *Id.* at 14,879. After noting his countervailing concern over the Compact's potential to increase the cost of milk for low-income families, the Secretary concluded that there is a compelling public interest in the Compact region in favor of authorizing the Compact, stating that, "the balance has been properly struck, given current conditions. The Compact is a short-term measure that, if implemented with common sense and sensitivity to the needs of all affected persons and interests, can benefit the dairy producers and all citizens in the Compact region without producing adverse side effects." *Id.* at 14,880.

At the time the Secretary published his Initial Finding, he also published a statement saying that he was "concerned about potential effects of the Compact in several respects" and that he would revoke his authorization if he determined that conditions

warranted revocation. 61 Fed.Reg. at 44,291. Likewise, in his Amplified Decision, the Secretary maintained that he would revoke authorization if he determined that changing conditions in the Compact region warranted such action. 62 Fed.Reg. at 14,880. However, in an addendum to his Amplified Decision, the Secretary retreated from this position. 62 Fed.Reg. 16,539 (1997) ("Addendum").

Following issuance of the Secretary's Amplified Decision, the parties cross-moved for summary judgment. The District Court granted Appellees' summary judgment motion and denied Appellant's summary judgment motion. *Milk Indus. Found. v. Glickman,* 967 F.Supp. 564 (D.D.C.1997) ("*MIF II*").

## II. ANALYSIS

■ We review the District Court's grant of summary judgment *de novo. See Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994); *see also Dr Pepper/Seven–Up Cos. v. FTC,* 991 F.2d 859, 862 (D.C.Cir.1993) ("Where the decision under review is the district court's assessment of the legal sufficiency of an agency's action in light of the record, ... [w]e proceed as if the Commission's decision had been appealed to this court directly," notwithstanding the intervening step; the district court's decision is not entitled to any particular deference) (internal quotations and citations omitted). On the APA claim, our review of the Secretary's finding is deferential. *See State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

### A. *Congress' Contingent Consent Was a Lawful Delegation*

In *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), the Supreme Court articulated what has come to be known as the "delegation doctrine." However, since *Field,* the Court has invalidated statutes on grounds of unlawful delegations on only two occasions, both of which occurred prior to the full development of the regulatory state ushered in by the New Deal. *See A.L.A.*

*Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). In recent decades, it has become widely accepted that Congress may, as a general matter, confer substantial authority upon a coordinate branch of government, as long as it provides an "intelligible principle" to guide the delegatee's exercise of the power conferred. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 372, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989).

### 1. The Power Delegated was Delegable Power

■ In the instant case, Congress made its consent contingent upon a finding by the Secretary that the Compact was in the compelling public interest of the Compact region. This act of contingent legislation is not substantially different from countless pieces of legislation passed by Congress over the last several decades—including many which have been challenged under the delegation doctrine and found to be constitutional by reviewing courts. We are unpersuaded by Appellant's efforts to distinguish the delegation in this case, on the grounds of both the nature of the legislative power delegated and the extent of executive action involved, from delegations that have been upheld as constitutional.

Appellant argues that consent to the Compact does not entail on-going administration of a regulatory scheme by the Executive Branch, on the assumption that this matters. However, precedent does not support Appellant's suggestion that contingent legislation is permissible only when associated with the administration of an on-going regulatory scheme. Rather, the Supreme Court has adopted the "general rule" that " '[a] constitutional power implies a power of delegation of authority under it sufficient to effect its purposes.' " *Loving v. United States,* 517 U.S. 748, ——, 116 S.Ct. 1737, 1748, 135 L.Ed.2d 36 (1996) (quoting *Lichter v. United States,* 334 U.S. 742, 778, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948) (alteration in original)). *See also Yakus v. United States,* 321 U.S. 414, 425–26, 64 S.Ct. 660, 668, 88 L.Ed. 834

(1944) ("Congress is not confined to that method of executing policy which involves the least possible delegation of discretion to administrative officers.").

The Court frequently has upheld Congress' delegation of responsibilities to the Executive through contingent legislation requiring an executive agent to take some action upon the finding of specified conditions. For example, in upholding Congress' delegation to the Price Administrator to fix commodity prices that would be fair and equitable and would effectuate the purposes of the Emergency Price Control Act of 1942, the Court stated:

> The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct.... These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective.

*Yakus,* 321 U.S. at 424–25, 64 S.Ct. at 667. Thus, the relevant distinction between the legislative and the executive is one of *function,* not of *frequency. See Loving,* 517 U.S. at ——, 116 S.Ct. at 1744 (" 'The true distinction ... is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. This first cannot be done; to the latter no objection can be made.' ") (quoting *Field,* 143 U.S. at 693–94, 12 S.Ct. at 505) (alteration in original).

In any case, the Secretary's delegated role here is consistent with the Secretary's role in the regulation of milk prices nationwide. In this instance, the Secretary was not asked to regulate milk prices directly. Instead, he was asked to determine whether permitting the Compact Commission to override the national minimum price for milk, in the case of the Compact states pending reform of the federal milk-pricing scheme, would be in the compelling public interest of the Compact region. This question implicates the Secretary's administrative role in regulating milk prices.

■ Appellant asserts that congressional consent to interstate compacts must be "effective of its own force, with no role for the Executive," Brief for Appellant at 11, but fails to offer any compelling reason why the compact consent clause should be understood differently from Congress' other Article I powers for the purposes of the delegation doctrine. *Cf. Loving,* 517 U.S. at ——, 116 S.Ct. at 1748 (Congress' power to "make Rules for the Government and Regulation of the land and naval forces" pursuant to U.S. CONST. art. I, § 8, cl. 14 ("Clause 14") "is no less plenary than other Article I powers") (citations omitted). If, as the Court held in *Loving,* Congress can lawfully delegate the power to define crimes—a power which is arguably at the height of that which might be defined as legislative—then surely it can lawfully delegate to the Secretary the power to authorize an interstate compact upon the finding that the Compact would serve a compelling public interest in the Compact region. Although it may still be possible to posit hypothetical instances of delegations which might be found unlawful, we are unconvinced that this is such an instance.

Appellant notes that, in *Loving,* the Court observed at length that the Executive has traditionally played a significant role in the regulation of the military, *see id.* at ——––, 116 S.Ct. at 1744–48, thus suggesting that *Loving* should not be viewed as a weighty precedent in this case. There is nothing in the *Loving* opinion that we can find, however, indicating that this historical fact is a limiting principle governing application of the delegation doctrine. Indeed, such a reading of *Loving* would conflict with previous statements of the Court. *See, e.g., Mistretta,* 488 U.S. at 385, 109 S.Ct. at 661 ("Our constitutional principles of separated powers are not violated ... by mere anomaly or innovation."). Rather, it appears that the *Loving* Court examined the historical practice of England as a tool for ascertaining the Framers' intent in drafting Clause 14. *See Loving,* 517 U.S. at ——, 116 S.Ct. at 1747 ("... the Framers knew well this history ...."). In addition, the Court emphasized the

lack of any clear and "absolute rule against" the delegation at issue in *Loving. See id.* at ——, 116 S.Ct. at 1748. Although Appellant maintains that the delegation at issue here is a novelty, it fails to identify any clear and absolute rule against such a delegation.

### 2. The Delegation Was Governed by an Intelligible Principle

■■■ Where the power at issue is a delegable power, Congress may provide discretionary authority to a coordinate branch of government "[s]o long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.' " *Mistretta*, 488 U.S. at 372, 109 S.Ct. at 655 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928) (second alteration in original)). Applying this general rule over the last several decades, the Supreme Court has upheld, "without deviation, Congress' ability to delegate power under broad standards," *id.* at 373, 109 S.Ct. at 655, including delegations authorizing the Executive to take action upon finding that it would be in the "public interest" to do so. *See, e.g., National Broadcasting Co. v. United States*, 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943) (upholding delegation to FCC to regulate broadcast licensing in the "public interest"); *New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932) (upholding delegation to ICC to authorize the consolidation of carriers where it finds that such consolidation would be in "the public interest"); *see also Yakus*, 321 U.S. at 425, 64 S.Ct. at 667–68 ("It is no objection [under the delegation doctrine] that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for [the delegated agent's] judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework.") (citations omitted).

The "compelling public interest in the Compact region" standard falls well within established "intelligible principle" parameters. Indeed, Appellant's arguments in support of its APA claim convincingly demonstrate that the "compelling public interest" standard is discernible and demanding. In advancing this argument, Appellant has no difficulty—nor do we—in defining the scope of the "compelling public interest" standard.

### B. *The Secretary's Finding Was Not Arbitrary and Capricious*

Congress' requirement that the Compact can only be authorized upon a finding of a compelling public interest in the Compact region provides a demanding standard requiring that the data and reasoning justifying the Secretary's finding weigh heavily in favor of authorizing the Compact. We find that the Secretary's Amplified Decision meets this standard.

### 1. The Secretary's Finding is "Agency Action" Reviewable Under the APA

■■■ As a threshold matter, the Secretary argues that his finding is not "agency action" reviewable under the APA, but rather "merely [a] determin[ation] that conditions in the Compact region met the condition set by Congress for implementation of the Compact." Brief for Appellee Secretary at 30. This is a distinction without a difference. The APA defines "agency action" to include agency rules, *see* 5 U.S.C. § 551(13), and defines an agency "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy. . . ." 5 U.S.C. § 551(4). The Secretary neither disputes that the APA's procedural requirements for informal rulemaking were satisfied, *see* 5 U.S.C. § 553, nor explains why his Amplified Decision should not be understood as a rule implementing congressional policy. We see no meaningful distinction between the delegation at issue here and the many acts of contingent legislation passed by Congress over recent decades. Through such contingent legislation, Congress enacts a policy (in this case, consent to the Compact), which is to be implemented upon the Executive's finding of the conditions specified by Congress (in this case, a "compelling public interest in the Compact region"). Clearly, the Secre-

tary's finding and his corresponding authorization of the Compact is a rule reviewable under the APA's "arbitrary and capricious" standard.

2. The Secretary's Finding of a Compelling Public Interest in the Compact Region is Not Arbitrary and Capricious

 ■Under familiar and well-established principles, the Secretary's finding must be upheld as long as the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)); *Republican Nat'l Comm. v. Fed. Election Comm'n*, 76 F.3d 400, 407 (D.C.Cir.1996) (APA's arbitrary and capricious standard of review is "satisfied if the agency enables us to see what major issues of policy were ventilated ... and why the agency reacted to them as it did") (internal quotations omitted), *cert. denied*, ── U.S. ──, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997). To meet this standard, the factors undergirding the Secretary's finding must be appropriate to the relevant context. In the instant case, four aspects of the relevant context are particularly noteworthy.

First, the Secretary was required to find a compelling public interest *in the Compact region*. *See* 7 U.S.C. § 7256 (Supp.1996). Thus, contrary to Appellant's arguments, how the situation of dairy farmers in New England compares to that of dairy farmers in the remainder of the country is largely irrelevant. Rather, an appropriate inquiry must focus on the Compact region measured in absolute, not relative, terms.

Second, it is significant here that Congress' consent to the Compact is for a very limited duration. Consent expires upon the completion of pending reforms of the federal scheme for regulating milk prices nationwide, rendering the Compact a transitional, interim measure. *See id.* (providing that Congress' consent "shall terminate concurrent with the Secretary's implementation of the dairy pric-

ing and Federal milk marketing order consolidation and reforms under section 7253 of this title").

Third, it is also important to bear in mind that, under the disputed legislation, the Secretary is not authorized to implement any particular regulatory measure, but, rather, to determine whether the Compact Commission should be allowed to regulate milk prices in the Compact region. Appellant argues that the Secretary erred in failing to give due weight to the possibility that increased milk prices might burden low-income families in the Compact region. However, any "weighing" of this factor must take into account the governance structure of the Commission, for it will be the Commission's actions, not the Secretary's, that will affect consumer prices. Significantly, the Commission is composed of equal numbers of representatives from each Compact state—those which are primarily dairy-consuming states as well as those which are primarily dairy-producing states. Compact art. III, § 4. In addition, at least one representative from each state must be a consumer representative, *id.*, a two-thirds vote of the Commission is required to raise farm-gate prices, and each state is subject to a Compact regulation increasing farm-gate prices only if the state's delegation votes for the measure. Compact art. III, § 5.

Finally, the record clearly identifies a strong consensus within the Compact states that the preservation of family dairy farms is of vital importance to the region's economic and environmental interests in a number of ways. Thus, although the availability of a sufficient supply of milk from large-scale farmers—even in the event that local family farmers go out of business—is a relevant inquiry in assessing whether there is a compelling public interest, it must be balanced against this countervailing factor of a strong regional desire to maintain family dairy farms.

Within this overall context, the Secretary's finding of a compelling public interest within the Compact region was reasonably supported by the following key factors: (1) a principal objective of the Compact is to preserve family farms in the Compact region; (2) family dairy farmers in the region are

under severe financial stress; and (3) the Compact will effectively preserve family dairy farms during the transitional period pending reform of the national scheme for regulating milk prices, at which time congressional consent will expire. These factors, in turn, were reasonably supported by the record before the Secretary. *See MIF II*, 967 F.Supp. at 571 n. 8 (citing portions of the record supporting key factors relied on by the Secretary).

Prior to this case, the Secretary, in reviewing milk prices pursuant to his authority under the AMAA, found that it would not be in the public interest to raise farm-gate prices in New England. *See* 58 Fed. Reg. 12,634 (1993). Appellant argues that this prior decision cannot be squared with the decision under attack here. We disagree. First, the question addressed by the Secretary in the instant case is not whether farm-gate prices should be increased, but whether the Compact Commission should be authorized to raise prices during the transitional period pending reform of the national price-regulation scheme. Notably, the factors relevant to a price determination in a federal milk marketing order under the AMAA and those considered by the Commission under the Compact are not identical. *Compare* 7 U.S.C. §§ 602, 608c(18) (1994) *with* Compact arts. I, IV, §§ 1, 9(e), (f). Moreover, individual states already possess the authority to regulate prices above the AMAA floor. *See United Dairy Farmers*, 335 F.Supp. at 1013. In a region in which individual state regulation is impracticable because of the small geographic area and the interrelationships among neighboring states, the Compact simply gives the New England region similar authority. Thus, permitting state governments to collaborate in setting farm-gate prices above the AMAA price floor is hardly incompatible with the objectives of the AMAA. In any event, even if the Secretary were deciding directly whether prices should be raised, it is well-established that he would not be bound by his prior decision, so long as the decision under review is well-reasoned. *See, e.g., DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C.Cir.1997); *National Audubon Soc'y v. Hester*, 801 F.2d 405, 408 (D.C.Cir.1986).

Furthermore, the fact that the Secretary considered possible negative consequences of authorizing the Compact does not render his finding invalid; rather, this merely demonstrates that the Secretary realized that the compelling public interest standard is a high hurdle and weighed factors on every side. In particular, the Secretary's concern that the Compact might result in higher retail prices for fluid milk in the Compact region does not invalidate his finding. The Secretary noted this concern, but, while expressing some uncertainty as to how the Commission would implement the Compact, he ultimately assumed that the Commission would be sensitive to consumer needs and thus that any rise in milk prices would not be so great as to offset the compelling public interests warranting authorization of the Compact. *See* Amplified Decision, 62 Fed.Reg. at 14,880. The reasonableness of this assumption is amply supported by the Compact's structural requirements designed to protect consumer interests, described above. As an additional safeguard to ensure that the Compact is implemented with sensitivity to all affected persons and interests, the Secretary offered the Commission the assistance of the Department of Agriculture to achieve this goal. *Id.*

Finally, the Secretary's initial emphasis on a perceived authority to revoke the Compact, followed by his acknowledgment that he lacks such revocation authority, is not determinative of the question before us. The Secretary first stated, in his Amplified Decision, that, "[g]iven the shifting nature of the compelling interest test, the Department strongly believes that the authority to withdraw or revoke its authorization is an essential element of any decision which finds that a compelling public interest exists." 62 Fed. Reg. at 14,880. In an Addendum to that decision, published approximately one week later, the Secretary recognized that he "may have inadvertently created the impression that it would have been impossible for [him] to authorize implementation in the absence of revocation authority" and clarified that, "[i]n fact, ... [his] finding of compelling public interest was based on a broad array of fac-

tors which [he] discussed in [the Amplified Decision and] was not contingent upon the existence of revocation authority." 62 Fed. Reg. at 16,539.

The Secretary's mistaken belief that he could revoke authorization of the Compact, should he determine that changing conditions warranted revocation, does not render his decision invalid in light of the demanding "compelling public interest" standard. In his Amplified Decision, the Secretary concluded that "given current conditions" authorization of the Compact was in the compelling public interest of the Compact region. 62 Fed.Reg. at 14,880. Rather than attempt to predict precisely how relevant conditions might play out in the future, the Secretary simply planned to revoke his authorization should changing conditions warrant. *See id.* ("Facts and circumstances that may currently justify authorization may subsequently change to the extent that a compelling public interest no longer exists in the Compact region."). However, when pushed to clarify whether—even without revocation authority and without being able to predict with certainty how relevant conditions might change—he anticipated that authorization nevertheless would be in the compelling public interest of the Compact region, the Secretary clarified that authorization was still warranted. *See* Addendum, 62 Fed.Reg. at 16,539. On the record at hand, we have no good reason to question this predictive judgment.

 Under the arbitrary and capricious standard of review, "an agency's predictive judgments about areas that are within the agency's field of discretion and expertise" are entitled to "particularly deferential" review, as long as they are reasonable. *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 821–22 (D.C.Cir. 1983) (citations omitted). The question of whether permitting the Compact Commission to override federal farm-gate prices pending the reform of the national milk pricing scheme would be in the compelling public interest of the Compact region implicates the Secretary's expertise in the regulation of milk prices. We find that the Secretary's predictive judgment on this point is reasonable, notwithstanding his confusion over the authority to revoke.

## III. CONCLUSION

For the reasons explained above, the District Court's decision granting Appellees' summary judgment motion and denying Appellant's summary judgment motion is affirmed.

*So ordered.*

ROGERS, Circuit Judge, with whom HENDERSON, Circuit Judge joins, concurring:

I join the opinion of the court and write separately only to note another reason underscoring why the condition requiring that the Secretary of Agriculture determine whether a compelling public interest existed in the Compact region does not involve an impermissible delegation.

The Compact Clause has always been recognized as a device to protect federal power from encroachments by the states. The Framers required the "Consent of Congress" before any state could "enter into any Agreement or Compact with another State." U.S. CONST. art. I, § 10, cl. 3. It has ever since been "evident that the [Compact Clause] prohibition is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *Virginia v. Tennessee,* 148 U.S. 503, 519, 13 S.Ct. 728, 734, 37 L.Ed. 537 (1893). As Joseph Story explained, "the consent of congress may be properly required, in order to check any infringement of the rights of the national government; and at the same time a total prohibition, to enter into any compact or agreement, might be attended with permanent inconvenience, or public mischief." JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1397 (1833); *see also* Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments,* 34 YALE L.J. 685, 694–95 (1925).

The Compact Clause was drafted at a time when the states were relatively powerful and

independent entities. The drafters of the Constitution sought to ensure the supremacy of federal power in interstate affairs. Although the drafters spoke of congressional consent, it is clear that they hoped not just to vindicate the legislative power of Congress, but to protect the power of the entire federal government with the Clause. Indeed, the Supreme Court has since recognized that the Compact Clause required congressional consent for interstate compacts *only* when the compact infringes upon federal power. *See, e.g., United States Steel Corp. v. Multistate Tax Comm'n,* 434 U.S. 452, 459–60, 471, 98 S.Ct. 799, 805–06, 811–12, 54 L.Ed.2d 682 (1978).

With this background in mind, it is clear that the process of consent in the instant case fully realized the purpose of the Compact Clause. The New England states appropriately sought congressional consent to the dairy compact, which will affect the federal regulation of milk prices pursuant to the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. §§ 601–624, 671–674 (1994). They obtained that consent from Congress and its delegate, the Secretary of Agriculture. Both Congress and the Secretary were capable of vindicating the federal power protected by the Compact Clause, the former under the Clause itself, and the latter by virtue of delegated and statutory powers. As the Supreme Court has observed, "the constitution makes no provision respecting the mode or form in which the consent of congress is to be signified, very properly leaving that matter to the wisdom of that body, to be decided upon according to the ordinary rules of law, and of right reason." *Green v. Biddle,* 21 U.S. (8 Wheat.) 1, 85–86, 5 L.Ed. 547 (1823). For these reasons, the balance of power envisioned in the Compact Clause has been preserved by the actions of the New England states, Congress, and the Secretary.